UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UPF CORPORATION,<br><br>    Plaintiff,<br><br>    v.<br><br>OLD DOMINION FREIGHT LINE, INC<br><br>    Defendant. | Case No.: 1:13-cv-00037 JLT<br><br>ORDER GRANTING IN PART PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT (Doc. 17)<br><br>ORDER DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT (Docs. 18)<br><br>ORDER GRANTING THE STIPULATION TO EXTEND THE DISCOVERY DEADLINE (Doc. 25) |

This case concerns the shipment of 10 slabs of zircon, magnesia refractories by Old Dominion Freight Line, Inc., which, when they arrived at UPF Corporation's location in Bakersfield, California, were chipped, cracked and not usable. UPF contends Old Dominion should reimburse it for the full value of the slabs but Old Dominion claims that, due to a limitation of its liability, the amount reimbursable is a small fraction of that sought. The parties filed cross-motions for summary judgment, each has opposed the other's motion and both have filed replies.

For the reasons set forth below, the Court **GRANTS IN PART** Plaintiff's motion and **DENIES** Defendant's motion.

I.     STATEMENT OF FACTS

In 2011, UPF contracted with Sullivan Refractory Brokers to purchase refractory material.

1

(PUDF[1] 11, 17)  Sullivan had in storage with Refractory Machining Services, Inc. slabs of zircon which suited UPF's needs.  RMS manufactured the slabs to the specifications requested by UPF and prepared the slabs for shipment.  Having used Old Dominion satisfactorily in the past, UPF notified Sullivan that it wished for the slabs to be shipped by Old Dominion.

RMS prepared a bill of lading using a standardized form it had used for about ten years and had found on the internet.  (PUDF 37, 40, 41) The form was developed by the motor carriers and transportation companies through an organization known as the National Motor Freight Traffic Association.  (UDF 6)  RMS made no modifications to the form but made certain entries on it.  Under the column "No. Packages," RMS entered "1 Pallet."   (UDF 10)  RMS entered "Refractories" in the next, untitled column and entered "1384" under the column entitled "Weight."  (UDF 10) Under the column entitled "Class or Rate," RMS entered "50" which, it is agreed, is the descriptor associated with "Magnesia Refractory, not dead burned, in bags, boxes or drums" set forth on the NMFTA's National Motor Freight Classification form.  (UDF 9, 10)  RMS did not know that using "Class 50" on the bill of lading bore any relationship to the rate that would be charged to UPF by Old Dominion.  (PUDF 48)  Likewise, RMS did not know that this classification related to a limit on liability should the slabs be damaged in transit.  (PUDF 48)

As was its custom, RMS did not indicate an "agreed" or "declared value" on the bill of lading.  (UDF 15; PUDF 49)  Old Dominion did not inform RMS that the failure to include a value could impact Old Dominion's liability for damage in transit or question the failure to include a value.  (PUDF 49)  RMS did not negotiate a shipping rate with Old Dominion and slabs were shipped "collect" so that the costs of the shipment were to be paid by UPF.  (UDF 10)  RMS did not discuss rates with Old Dominion and did not know what rate UPF would pay for the shipping or what the shipping costs would be.  (PUDF 47)  Likewise, UPF did not receive a rate quote from Old Dominion before the slabs were shipped.  (PUDF 24)

Old Dominion received the pallet of zircon slabs on August 17, 2011 at RMS' location. (UDF 4, 17)  RMS' provided to Old Dominion only the front page of the bill of lading, as was its custom,

---

[1] The Court refers to Plaintiff's Additional Undisputed Facts (Doc. 17-3) as "PUDF" and Defendant's Additional Undisputed Facts (Doc. 18-2) as "DUDF."

despite that the bill references terms set forth on the "back" page.  (PUDF 43[2]; UDF 11)  Notably, the bill of lading indicated that Old Dominion received the shipment "in apparent good order, except as noted" and did not "note any exceptions on the bill of lading."  (UDF 4, 11)  The zircon slabs were damaged in transit and when they arrived in Bakersfield, the slabs were chipped and one also suffered a severe fracture.  (UDF 20)

UPF sought reimbursement from Old Dominion for the value of the slabs, initially in the amount of $13,500 but later revised it to $11,828,88, but Old Dominion offered to pay only $0.99 per pound.  (UDF 23)  Old Dominion asserted that its liability for damage was limited by RMS' describing the shipment as Class 50.  (UDF 23)

## II.     STANDARDS FOR SUMMARY JUDGMENT

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Accordingly, summary judgment should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In addition, a court may grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that claim. Fed. R. Civ. P. 56; *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981).  The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same.  *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

A party seeking summary judgment bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact.  *Celotex,* 477 U.S. at 323.  An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact

---

[2] Though Old Dominion claims a dispute as to this fact, it fails to cite to any evidence demonstrating a dispute exists.

3

is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987). The moving party demonstrates summary judgment is appropriate by "informing the district court of the basis of its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (citation omitted).

If the moving party meets its initial burden, the burden shifts to the opposing party to present specific facts that show there is a genuine issue of a material fact. Fed R. Civ. P. 56(e); *Matsuhita*, 475 U.S. at 586. An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 587. The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits. *Id.* at 586, n.11; Fed. R. Civ. P. 56(c). Further, the opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987). However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322.

In resolving a motion for summary judgment, the Court examines the evidence provided by the parties, including pleadings depositions, answer to interrogatories, and admissions on file. *See* Fed. R. Civ. P. 56(c). Even if a motion for summary adjudication is unopposed, a court cannot grant summary judgment solely because no opposition has been filed. *Cristobal v. Siegel*, 26 F.3d 1488, 1494-95 & n.4 (9th Cir. 1994). The Court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law. *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).

### III.     Evidentiary Objections

Rule 602 provides that a witness may not testify unless "the witness has personal knowledge of the matter." Fed. R. Evid. 602. A lay witness may testify only as to those opinions or inferences which are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of

the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Both parties raise evidentiary objections for a lack of personal knowledge. Specifically, Old Dominion objects to certain statements in the declarations of James Frye (Doc. 17-5) and Douglas Legron (Doc. 17-6), while UPF seeks to have the supplemental declaration of Geoff Stephany (Doc. 19 at 18) stricken.

### A.      Frye declaration

Plaintiff cites Mr. Frye's declaration as support for the fact that Refractory Machining Services inspected the zircon slabs "to ensure that they met specs and were in good condition" when tendered to Old Dominion. (Doc. 19-1 at 21-22, citing Frye Decl. ¶ 43.) Old Dominion objects that "James Frye failed to lay a personal knowledge foundation regarding the condition of the Shipment at the time it was tendered to Old Dominion for transportation." (Doc. 19-1 at 21, 22.)

UPF argues this contention is without merit, because Mr. Frye reported he had "personal knowledge of the matters set forth in []his declaration."[3] (Doc. 22 at 8, citing Frye Decl. ¶ 1.) UPF contends Mr. Frye's personal knowledge of the condition of the zircon is apparent because he asserts that "Refractory Machining Services always carefully inspects any outbound shipment of refractories to ensure quality control" and the company "took [the] refractories meeting UPF's specs out of storage, performed such machining services on some of the slabs as was necessary, then inspected them and the remaining pieces of zircon that did not require machining to ensure that they met specs and were in good condition, packaged them and then tendered them to Old Dominion." (Id., quoting Frye Decl. ¶ 43.) In addition, UPF asserts "Mr. Fryes' (sic) personal involvement in the preparation of the Shipment for transportation is evident from his testimony stating that 'I had the Shipment weighed on certified scales prior to its tender to Old Dominion.'" (Id. at 9, quoting Frye Decl. ¶ 46).

Significantly, however, Mr. Frye does not assert that he personally inspected the zircon slabs to determine the condition, that he performed the necessary machining services or that he had any personal awareness of UPF's order. Instead, he attests only to what is done normally. Likewise, it is

---

[3] Notably, this is a mere conclusion and, absent sufficient factual support to demonstrate the declarant *actually* has personal knowledge of that which is declared, it is meaningless.

unclear whether Mr. Frye weighed the Shipment on certified scales, or whether an employee weighed the Shipment at his behest. Consequently, Mr. Frye failed to set forth facts supporting the conclusion that he possessed personal knowledge of the condition of the zircon slabs at the time the Shipment was tendered to Old Dominion. Defendant's objection is **SUSTAINED**.

### B.     Legron declaration

Mr. Legron opines, "The damage to the Shipment made it completely unfit to fulfill its intended purpose of lining and tightly sealing the interior of UPF's furnace, rendering it a total loss to UPF." (Doc. 17-6 at 5, Legron Decl. ¶ 34.) Further, Mr. Legron believed the zircon "was not salvageable by UPF" because "[i]t was a very unique product with a very specific purpose for a particular industry." (Id., ¶ 35.)

Defendant asserts these statements should not be admitted because Mr. Legron "failed to lay a personal knowledge foundation regarding the condition of the Shipment at the time it was delivered to UPF and provided no indication of when, in relation to the delivery, he formed the conclusion that the components of the Shipment were unfit for their intended purpose." (Doc. 19-1 at 24.) Further, Old Dominion asserts Mr. Legron "provided no indication of when, in relation to the delivery, he formed the conclusion that the components of the Shipment were not salvageable." (Id.)

In response, Plaintiff argues, "Mr. Legron testified that he is UPF's purchasing agent, that it was part of his job duties to purchase supplies and materials for the production of fiberglass, and that he was involved in the purchase of the zircon slabs which constituted the Shipment incident to his job duties." (Doc. 22 at 13, internal citations omitted.) According to UPF, "As part of his job duties, Mr. Legron could reasonably be expected to be informed and knowledgable (sic) about whether the damaged zircon pieces could be salvaged, since it was his job duty to find replacement pieces of zircon for UPF." (Id.)

Notably, Defendant admits "[t]he Shipment suffered damage while in transit with Old Dominion." UPF 19. The parties agree also that each of the zircon slabs were chipped and one was also severely chipped when they arrived at UPF's location. UPF 20. The condition of the shipment at the time it was received by Old Dominion, is not an opinion within the personal knowledge of Mr. Legron but, more importantly, he does not so opine. Instead, he notes that "When the Shipment

arrived at UPF's plant in Bakersfield, it was observed and noted by UPF's Receiving Department to be badly damaged." (Doc. 17-6 at 4)  Likewise, he asserts, "Old Dominion's driver, "George G," signed the Delivery Receipt to acknowledge the damage to the Shipment" and "The damage to the Shipment made it completely unfit to fulfill its intended purpose of lining and tightly sealing the interior of UPF's furnace, rendering it a total loss to UPF."  Id. at 5.

Indisputably, the shipment was "damaged."  Whether and the extent to which it was damaged in transit, is the question.  Undeniably, Mr. Legron has failed to establish he has personal knowledge of the condition of the slabs at the time they were received by Old Dominion.  Likewise, he cannot say that the condition of the slabs at the time they arrived at UPF was caused by the transportation provided by Old Dominion, although that is the implication of his affidavit given he submitted a claim to the carrier for the damage.  However, despite this implication, he does not express an opinion that the damage was caused during transit.  Thus, the objection is **OVERRULED.**

Also, the Court concludes that the evidence Mr. Legron provides about the length of time at his job and his job requirements—including the specifications for zircon slabs—demonstrates he *can* attest to the needed condition for the slabs to be fit for their intended purposes. Therefore, Defendant's objections to Mr. Legron's statements that the zircon slabs were unusable, given the condition they were in at the time of delivery, are **OVERRULED**.

      C.      **Supplemental declaration of Geoff Stephany**

Plaintiff requests that the supplemental declaration of Mr. Stephany, submitted in support of Defendant's opposition to the summary judgment, be stricken. (Doc. 22 at 6.)  Mr. Stephany asserts he is "the Director of Security and Claims for Old Dominion Freight Line, Inc." and he "reviewed Old Dominion's records for the shipment history of UPF Corporation and its related entity, Consolidated Fiberglass Products, Inc." (Doc. 19 at 18, Stephany Decl. ¶¶ 1-2.)  Mr. Stephany purports to state facts regarding UPF's prior use of Old Dominion for shipping.  UPF asserts his entire declaration "is inadmissible hearsay and should be stricken." (Doc. 22 at 6.)  To the extent that Mr. Stephany offers "testimony concerning what he learned from having read unidentified records," UPF argues Mr. Stephany failed to "offer into evidence…the actual records to which he alludes." (Id. at 7.)

Although Mr. Stephany asserts he has "personal knowledge" of the facts to which he attests,

7

presumably from reviewing the documents, he makes no attempt to demonstrate the records upon which he relied fit within the business records exception to the hearsay bar. Fed. R. Evid. 803(6). Thus, Mr. Stephany's declaration provides multiple layers of hearsay.

Likewise, Mr. Stephany fails to attest to the documents he reviewed such that the Court can be confident of the reliability of the information contained therein. In addition, it is clear, it appears the "facts" asserted by Mr. Stephany appear to be based only upon document review and not his personal knowledge, the declaration must be excluded. See L.H. v. Schwarzenegger, 519 F.Supp.2d 1072, 1078-79 (E.D. Cal. 2007) (explaining a declaration offered by the defendants was "flawed" because the declarant's statements were not "based on his personal knowledge and observations"); see also School Dist. No. 1J v. ACandS, Inc., 5 F.3d 1255, 1262 (9th Cir. 1993) (where documentary evidence is cited as the source of a fact, the documents must be attached to the declaration pursuant to Fed. R. Civ. P 56(e)). Therefore, Plaintiff's objections are **SUSTAINED**, and paragraphs 3-4 of Mr. Stephany's declaration are **STRICKEN**.

### D.     Speculative and conclusory statements

To the extent that statements offered are speculative or represent a legal conclusion, the Court, as a matter of course, will not factor that material into the analysis. See Burch v. Regents of the Univ. of Cal., 433 F. Supp.2d 1110, 1119 (E.D. Cal. 2006) ("[S]tatements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not facts and likewise will not be considered on a motion for summary judgment. Objections on any of these grounds are simply superfluous in this context.") (citation omitted, emphasis in original).

## IV.     DISCUSSION AND ANALYSIS

"The Carmack Amendment[4], . . . , subjects a motor carrier transporting cargo in interstate commerce to absolute liability for 'actual loss or injury to property.'" Hughes Aircraft Co. v. N. Am. Van Lines, Inc., 970 F.2d 609, 611 (9th Cir. 1992). However, according to the Cummins Amendment (49 U.S.C.§ 14706(c)(1)(A)), a carrier may limit its liability. The parties agree that for Old Dominion to have done so as to the shipment as issue, it must have "(1) maintain[ed] a tariff in compliance with

---

[4] This amendment is found at 49 U.S.C. § 14706.

the requirements of the Interstate Commerce Commission; (2) give[n] the shipper a reasonable opportunity to choose between two or more levels of liability; (3) obtain[ed] the shipper's agreement as to his choice of carrier liability limit; and (4) issue[d] a bill of lading prior to moving the shipment that reflects any such agreement." Id. Old Dominion has the burden of proving it complied with these requirements. (Hughes, at 612)

### A. Old Dominion maintained a tariff in compliance with the requirements of the Interstate Commerce Commission

With virtually no analysis, Old Dominion argues because it maintained a tariff[5], it satisfied the first element of the Hughes test. (Doc. 18-1 at 15) UPF did not contest that Old Dominion fulfilled the first element of the Hughes test when it drafted its own motion for summary judgment. (Doc. 17-1 at 9 ["[I]t would appear that this first element of the Hughes test is met here."]) However, in its opposition to Old Dominion's motion, UPF argues that the tariff failed to provide for shippers sending items collect, to obtain a higher level of protection for its cargo and, therefore, concluded that the tariff is "fundamentally flawed." (Doc. 20 at 6) UPF also takes exception to the fact that the tariff fails to provide two levels of coverage, one of which is full-value coverage for shipping who ship items collect.

The Court rejects UPF's argument. First, it is undisputed that Old Dominion maintained a tariff which set forth the terms and conditions of its services and made it available to customers. UDF 12. Second, UPF's argument regarding the content of the tariff is best addressed when discussing the second of the Hughes elements, as Plaintiff argued in its motion for summary judgment. If the Hughes Court intended the first element to encompass an evaluation of whether the tariff adequately offered two or more options for liability coverage, it would have likely merged these two elements. Likewise, the Court notes the tariff here *does* contain information related to increasing the coverage for collect shippers (Doc. 17-2 at 26), though, as more fully discussed below, exactly what the tariff means in this regard, is unclear. Thus, the Court concludes the first element of the Hughes test is met.

///

---

[5] Notably, the portion of the tariff submitted, fails to address the shipping rates, though it provides the portion of the tariff which addresses the liability for losses and the opportunity to obtain additional liability coverage. Because UPF fails to address this point, the Court presumes it does not contest that the tariff, indeed, provides the standard shipping rates.

**B.     Old Dominion did not give UPF a reasonable opportunity to choose between two or more levels of liability coverage**

To allow the shipper a reasonable opportunity to select between different levels of liability coverage, the shipper must have had reasonable notice of the limitation on liability and the opportunity to obtain information to make a deliberate choice. Hughes, at 612. "The agreement must evidence an "absolute, deliberate and well-informed choice by the shipper." Id.

Old Dominion's tariff notified shippers that for class 50 cargo, the liability for damage would be limited to $0.50 per pound. (Doc. 17-2 at 13)  Moreover, Old Dominion offered shippers shipping "prepaid" cargo, the option of increasing the amount of coverage as long as the shipper made known on the bill of lading, the desire for it. Id. at 25.  The tariff reads,

> ODFL can provide additional levels of carrier liability, exceeding the default liability limits set forth in Item 594 on *prepaid* shipments (See NOTE A) using truck conveyed transportation, subject to the following terms and conditions:
>
> [¶¶]
>
> 3. DECLARATION:  The request for additional levels of carrier liability must be declared on the original Bill of Lading before the shipment is picked up by ODFL, or otherwise be requested in writing by the shipper prior to shipment.
>
> [¶¶]
>
> 7. RATES: To obtain the additional levels of carrier liability from ODFL, shipper must agree to pay, and must actually pay an increased shipping rate of $0.60 per one hundred dollars of valuation as defined in Item 4[6] above, subject to a $45.00 minimum charge per shipment.
>
> [¶]
>
> NOTE A – Additional levels of carrier liability can be provided on Collect shipments when written authorization is [sic] advance of shipment has been agreed upon between the parties.

(UDF 14, emphasis added)  Thus, exactly what is required to increase liability coverage for collect shipments is not clearly set forth in the tariff. Indisputably, Old Dominion must authorize the higher level of coverage as must the shipper and the respective authorizations must be written and exchanged

---

[6] Item 4 reads, "Valuation; Valued at amount of the declared value on the bill of lading that has been supplied by the shipper/consignee on the bill of lading, freight charges, plus 10%. Declared value can not [sic] be more than actual invoice cost of the goods shipped." (UDF 14)

before the shipment is accepted.  Thus, it seems as though even had RMS indicated on the bill of lading, as permitted by Item 3, that it desired a higher level of coverage, this effort would have been ineffective.  To conclude otherwise would render Note A a redundancy.[7]

Moreover, it is unclear what the rate would apply for a collect shipment when the shipper wants higher coverage.  The section related to the rate increase for the concomitant increase in liability coverage requires *prepayment* of the increase. Had the intention been that the section would apply both to prepaid *and* collect shippments, the section on rates would read, "shipper must agree to pay *or* must actually pay an increased shipping rate . . ."  A collect shipper would never prepay a shipping rate so, as currently worded, this section does not appear to apply.

Moreover, Old Dominion fails to offer any analysis as to how the "Rate" paragraph or any of the paragraphs in Item 574 applies to the facts at hand.  (Doc. 13-37)  Indeed, at the hearing, counsel posited that none of the paragraphs 1 through 8 applied to collect shipments though this is hard to accept in light of the fact that paragraph 6 sets forth the "perils"—including a nuclear incident, for example—from which the added coverage would not protect.  (Doc. 17-2 at 26)  There is no rationale that would explain why Old Dominion would exempt from coverage these perils for those prepaying for their shipment but would cover these perils for collect shipments.

Likewise, if paragraph 7, which sets forth the rates for added coverage, does not apply, then the tariff does not provide any information for a shipper of a collect shipment.  Thus, either the "Rates" paragraph applies or it doesn't.  If it does, it fails to explain to shippers of collect shipments what the cost—or tariff—would be for added liability coverage.  If the paragraph *does* apply, then it fails to explain to a shipper of a collect shipment how to obtain the coverage given it requires *prepayment* of the added cost—which makes no sense for a collect shipper, as noted above.

Given the ambiguity of the tariff as to collect shipments,[8] the Court cannot find that that the decision not to obtain a higher level of liability coverage was based upon a well-informed choice.  Hughes, at 612.  A similar conclusion was found in Sassy Doll Creations, Inc. v. Watkins Motor Lines,

---

[7] This conclusion is supported by the fact that the bill of lading is provided at the time it the shipment is received by the carrier; not in advance of the receipt of the shipment.

[8] The Court rejects counsel's argument made at the hearing that even with this ambiguity the tariff was sufficient to satisfy the third element of the Hughes test.  Notably, this position is contrary to Hughes which requires, the shipper be provided a "well-informed choice." Id.

11

Inc., 331 F.3d 834, 842 (11th Cir. 2003), where the court held that the mere presence of the "declared value box" was insufficient to find the shipper accepted the lower liability coverage when the tariff required something more. The court observed, "The additional requirement might not be a problem if the shipper could determine from looking at the tariff and the bill of lading exactly how to indicate a desire for full value coverage." Id.

Here, as in Sassy Doll, the tariff is so ambiguous as to leave RMS/UPF uninformed as to how to obtain a higher level of liability coverage for this collect shipment. Thus, Because Old Dominion has failed to offer evidence in support of its position as to this element, the Court is forced to find it has not met its burden of proof.

**C.     The evidence does not demonstrate Old Dominion obtained UPF's agreement as to the choice of carrier liability limit**

The bill of lading "is a contract between the carrier and the shipper." OneBeacon Ins. Co. v. Haas Indus., Inc., 634 F.3d 1092, 1098 (9th Cir. 2011). Courts "apply general principles of contract interpretation when construing a bill of lading." Id.

Here, the bill of lading provided by RMS carried express language that "Old Dominion Carrier RECEIVED, subject to the classifications and tariffs in effect on the date of this Original Bill of Lading . . . The property described below . . ." UDF 11. Likewise, the parties agreed that the service provided "shall be subject to all terms and conditions of the Uniform Domestic Straight Bill of Lading set forth . . . in the applicable motor carrier classification *or* tariff if this is a new motor carrier shipment." (UDF 11, emphasis added.) Further it reads, "Shipper hereby certifies he is familiar with all the terms and conditions of said bill of lading, including those on the back thereof, set forth in the classification *or* tariff which governs the transportation of this shipment, and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns." Id., emphasis added. Of course, despite the reference to a back page of the bill of lading, the back side of the bill of lading was blank. (UDF 43)[9]

---

[9] Though Old Dominion disputes this fact, rather than providing evidence that there *was, in fact*, a back side to the bill of lading, it merely cites the language of the bill of lading which the Court set out above. This does not demonstrate a dispute of fact exists that the bill of lading provided by RMS had terms printed on the reverse. Thus, the Court finds there is no genuine dispute of fact that no back side of the bill of lading was exchanged by the parties.

Neither party offers analysis of the meaning of these statements set forth in the bill of lading. However, the plain meaning of the first statement indicates that Old Dominion received the slabs based upon its understanding that the shipment would be "subject to"—or, presumably, governed by—the classification and the tariff. UDF 11. The bill of lading doesn't provide for an assent by the shipper that this would be the case. Instead, the second sentence sets forth above, notes only the parties' agreement that the shipment be governed by the terms and conditions *of the bill of lading*, the terms and conditions of which are set forth *either* in the applicable motor carrier classification *or* the tariff. This statement does not document agreement that the general terms and conditions—except those duplicated in the bill of lading—of either the applicable motor carrier classification or those of tariff would apply.

On the other hand, the third statement noted above, documents an agreement of the parties that the shipment would be governed by *either* the terms and conditions of the tariff *or* those of the "classification;" but not both. Thus, seemingly, the bill of lading fails to demonstrate a meeting of the minds that both the classification and the tariff would apply or which of the two documents, either the classification or the tariff, would apply. The extrinsic evidence presented by UPF seems to demonstrate that it was intending, at most, to be bound only by the classification[10] selected. (Doc. 17-5 at 34)

On the other hand, for a bill of lading to limit the liability of the carrier, it must contain an "inadvertence clause." Hughes, 970 F.2d at 611-612 n.3 citing Rohner Gehrig Co., Inc. v. Tri–State Motor Transit, 950 F.2d 1079, 1082 (5th Cir.1992). This clause specifically informs the shipper of the "released rate"—the maximum liability expressed in a dollar-per-pound rate—and that this rate will apply unless the shipper indicates otherwise. Hughes, at n.3. Here, the bill of lading fails to set forth the released rate and this amount can only be accessed by referring to Old Dominion's tariff associated with class 50 goods. However, again, as noted above, there is an insufficient showing that UPF, through RMS, agreed to be bound by the tariff.

In OneBeacon, the Court found the carrier had complied with the four-part test in part because

---

[10] However, even this is doubtful. It appears that in selecting "class 50," RMS was attempting only to describe the materials being shipped. Moreover, as admitted by counsel at the hearing, there is no evidence submitted that there *are* terms and conditions in the applicable motor carrier classification. Indeed, the only evidence submitted is that the classifications *only* describe the materials being shipped.

the bill of lading advised the shipper that liability was limited to "$50 or $0.50 per pound in the absence of a higher declared value. The bill of lading also explain[ed] that Haas will be liable for the actual value of the shipment if the shipper declares the value and pays an excess valuation charge." OneBeacon, 634 F.3d at 1100.  Thus, generally, if the bill of lading does not specify any limitation on liability as the default rate, "then the carrier is responsible for 'the actual loss or injury to the property.' 49 U.S.C. § 14706(a)(1)." Id., at 1100-01.

Here, the bill of lading reads, "Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property." (UDF 15)  It also reads, "The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding _____ per _____." Id.  Notably, a dollar sign was not included in advance of either blank space and RMS did not place a valuation in either blank spaces. (Id; UDF 16)  Also notable is the fact that no rate was negotiated by Old Dominion with either RMS or UPF.  Indeed, there is no showing that the rate charged by Old Dominion depended upon the value of the slabs nor is there any showing that Old Dominion ever knew the value of the slabs until after they arrived in Bakersfield.

Moreover, as discussed above, the tariff did not allow an increase in the liability coverage on this collect shipment to be obtained merely by RMS noting a declared value on the bill of lading. (Doc. 17-2 at 26)  Thus, for all of the reasons set forth, the Court does not find Old Dominion has met its burden to demonstrate the third Hughes element.

**D.     The evidence does not demonstrate Old Dominion issued a bill of lading that reflects an agreement to limit its liability**

For the reasons set forth above, the Court does not find the bill of lading reflects an agreement that the liability of Old Dominion be limited.  The bill of lading contains contradictory and confusing terms that do not make it clear that it is an attempt by Old Dominion to limit its liability.  The Court does not find that the Cummins Amendment intended to create a trap for the unwary and the failure of Old Dominion to provide explicit information about the limits of its liability, whether through the bill of lading or its tariff, must be construed against it.

**E.     Conclusion**

Based upon the foregoing, the Court finds that UPF is entitled to judgment on the issue of

14

whether Old Dominion properly limited its liability and, in this regard, its motion is **GRANTED**. For the same reasons, the Court **DENIES** Old Dominion's motion on this topic.

### V. UPF has failed to establish a prima facie case of liability.

To demonstrate a prima facie case of liability, UPF must demonstrate the slabs were received in good condition by Old Dominion, the items were damaged while in transit and the amount of damages that were caused thereby. Missouri Pacific Railroad Co. v. Elmore, 377 U.S. 134, 138 (1964).

#### A. UPF has failed to demonstrate the shipment was received by Old Dominion in good condition

As noted above, the declaration of Mr. Legron fails to demonstrate any personal knowledge as to the condition of the slabs when they were received by Old Dominion. The bill of lading notes only that the slabs were "in apparent good order." Courts agree that this phrase means only that those slabs that were visible and open to inspection. D.P. Apparel Corp. v. Roadway Exp., Inc., 736 F.2d 1, 4 (1st Cir. 1984); Accura Sys., Inc. v. Watkins Motor Lines, Inc., 98 F.3d 874, 878 (5th Cir. 1996); Tuschman v. Pennsylvania Railroad, 230 F.2d 787 (3d Cir. 1956); Hoover Motor Exp. Co. v. United States, 262 F.2d 832, 834 (6th Cir. 1959). Here, there is no showing that any of the slabs were visible at the time they were received by Old Dominion. Indeed, the invoice seems to demonstrate the pallet was shrink-wrapped which implies that, at most, only the top slab was visible. (Doc. 17-2 at 11) In any event, because there is no showing as to how the slabs were packaged, the Court cannot conclude the slabs were able to be visualized by Old Dominion. Thus, the Court does not find Old Dominion's failure to note a problem in the condition of the slabs on the bill of lading determines they were in good condition at the time of their receipt for shipping.

#### B. UPF has demonstrated the slabs were damaged while in transit

The parties agree the shipment was damaged in transit. UDF 19. The parties agree also that each of the slabs were chipped and one was also cracked when they arrived in Bakersfield. UDF 20. The parties do not agree as to the extent to which each of the slabs was damaged in transit or, for that matter, that each slab was damaged while in transit.

///

///

**C.     UPF has failed to demonstrate the damages occurred in transit.**

As noted above, UPF has failed to demonstrate the good condition of the slabs at the time they were received by Old Dominion. Moreover, though the shipment as a whole was damaged while in transit, UPF has failed to demonstrate the extent of that damage.

**D.     Conclusion**

Based upon the foregoing, the Court finds UPF is not entitled to judgment on this point and, therefore, as to liability, its motion is **DENIED**.

## VI.    Attorney's Fees

In its complaint, UPF sought an award of attorney's fees in its prayer. (Doc. 1 at 3) Old Dominion seeks summary judgment on this issue and argues that, under the Carmack Amendment fees are not awardable. In response, UPF requests that its prayer for fees be withdrawn. (Doc. 20 at 15) UPF's request is **GRANTED** which means that Old Dominion' motion on this point is **MOOT**.

## VII.    CONCLUSION AND ORDER

As set forth above, neither party has demonstrated they are entitled to summary judgment. *Celotex,* 477 U.S. at 323. While Plaintiff has demonstrated that Old Dominion has failed to properly limit its liability, Plaintiff has failed to demonstrate a prima facie case of liability.

Based upon the foregoing, it is **HEREBY ORDERED**:

1. Defendants' motion for summary judgment (Doc. 18) is **DENIED**;
2. Plaintiff's motion for summary judgment (Doc. 17) is **GRANTED** as to the failure of Old Dominion to limit its liability and **DENIED** as to the issue of liability;
3. The stipulation (Doc.25) to extend the discovery deadline to February 28, 2014 is **GRANTED**.

IT IS SO ORDERED.

Dated:   **December 12, 2013**            **/s/ Jennifer L. Thurston**
                                                         UNITED STATES MAGISTRATE JUDGE